UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LEONA ROSEMARY HAMMOND,

           Plaintiff,

v.                                             Case No.  5:05-cv-114-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

           Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining their respective positions. (Docs. 15 & 16.) For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **REVERSED AND REMANDED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability benefits on December 31, 2001, alleging an onset date of September 1, 1997. (R. 25, 42-43.) Her disability claims were denied initially and upon reconsideration. (R. 27, 30, 33, 35, 36.) Plaintiff requested a hearing before an Administrative Law Judge, which was held on February 23, 2004. On April 26, 2004, following the hearing, Administrative Law Judge Albert D. Tutera (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 13-18.)  Plaintiff's

request for review of that decision was denied by the Appeals Council on January 14, 2005, rendering the ALJ's decision the final decision of the Commissioner.  (R. 4-6.)

## II. ISSUES PRESENTED

The Plaintiff raises two issues on appeal. First, Plaintiff contends that the ALJ did not properly consider the limitations regarding Plaintiff's fingering or handling abilities on her residual functional capacity ("RFC"), nor in determining whether she could perform her past relevant work as a secretary. Second, the Plaintiff asserts that the ALJ erred in failing to find Plaintiff's depression severe at step two and in failing to consider how such depression might affect Plaintiff's RFC at step four. The Commissioner argues that there was substantial evidence in the record supporting the ALJ's finding that Plaintiff's alleged handling limitations were not so severe as to interfere with her ability to perform her past relevant work. The Commissioner also asserts that the Plaintiff failed to meet her burden to show that she had a severe depressive disorder on or before the last date of her insured disability period.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d
(continued...)

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

---

[2](...continued)
842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

3

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the

---

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back

---

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV.  SUMMARY OF THE RECORD

Because the Plaintiff only challenges the ALJ's analysis with regard to her manipulative limitations and mental impairment as part of the ALJ's determination of Plaintiff's RFC, the Court will focus its discussion of the record on those issues.

### A. *Personal Background*

Plaintiff, born on September 20, 1946, was fifty-seven years old when the ALJ rendered his decision. (Doc. 13, R. 43.) She completed high school and has a certificate as a Certified Nursing Assistant. (R. 83A) Plaintiff alleged disability due to various conditions including chronic lumbar back pain with spondylosis and myofascial pain, neck and shoulder pain, high blood pressure, headaches, bilateral carpal tunnel syndrome, nerve damage, swollen feet and legs, loss of balance, leg weakness, and constant pain. (R. 49, 51-52, 54, 56, 62, 127, 193-194, 252.) She also took various medications for her back and other pain (Bextra, Metrocebol, and Tylenol), as well as medication to control her blood pressure (Ziac, Zebeta, Lasix, Micro-K, Norvasc, and Vasotec), and aspirin. (R. 83B.) The side effects of these medications include fatigue, drowsiness, dry mouth, and stomach upset. (*Id.*) Plaintiff worked as a secretary in an insurance office from May of 1989 until September of 1997, her alleged onset date. Prior to that, she worked for a year at the Marion County Health Department as an office worker/secretary. (R. 50, 72, 219.) Plaintiff also worked as a nursing assistant in a nursing home from 1981-1984. (R. 72.)

As a secretary for the insurance company, her duties included typing, answering the phone, filing claims, board work,[21] and supervising the phone room. She walked for about thirty minutes to three hours in her job, stood for two to three hours, sat for two to five hours, and spent a good part of the day writing, typing, or handling small objects, especially when sitting. She did not have to climb, kneel, crouch, or crawl. The heaviest objects she lifted weighed about ten pounds and she frequently lifted objects of less than ten pounds. She also supervised others in this job. (R. 50, 73, 83B, 219.) As an office worker for the Maternity Department, the physical requirements of her job were about the same as described above. She did not have any supervisory duties in this position. (R. 74.) As a nursing assistant, Plaintiff spent the day caring for and cleaning patients. She spent most of the day walking or standing, stooping, kneeling, crouching, and handling large objects. She had to lift and carry patients. The heaviest objects she lifted were one hundred pounds or more, but she frequently lifted objects of fifty pounds or more. She had no supervisory duties in this job.  (R. 75.)

## B. *Hand/ Arm Impairment*

Plaintiff worked as a secretary but it became difficult for her to type and use a computer keyboard. Others had to be hired to take over her typing duties and she answered the phones until it became difficult for her to sit for extended periods of time. (R. 49.) Plaintiff claimed that due to pain, which radiated from her shoulder to her elbow, she was not able to raise her right arm very high. (R. 62.) She also suffered from pain and numbness in her hands and arms. (R. 62-63.) Plaintiff found that the pain in her

---

[21] "Board work" entailed updating a white board with information about thirty regional offices which required the Plaintiff to stand and write for two hours a day. (R. 83B.)

hands and arms caused her to take longer to dress. She could only drive for short distances because her arms became numb after thirty to forty-five minutes of driving and continuous moving of her hands.

On a form completed by Dr. Phillips on April 22, 2002, he noted that Plaintiff had grip strength of 3/5 bilaterally and some limitation on fine and alternative movement.  (R. 110.) In 2003, Dr. Webb treated Plaintiff for her back, and noted that Plaintiff should not lift more than ten pounds. (R. 123.) No mention was made, nor treatment recommended, for difficulties Plaintiff was having with her hands. (R. 123, 133,135.) In his report in 2003, Dr. Corwin noted that Plaintiff complained of problems with her right hand. (R. 182-83.) In his February 2004 assessment, Dr. Phillips noted that Plaintiff had decreased sensation in her left hand which made handling and feeling difficult.

Plaintiff testified that she had nerve damage in her left hand which occurred when the surgeon performing her stomach operation in 1987 hit a nerve while inserting an IV. (R. 236.) She testified that she was having trouble at work due to her left hand. She could not use the computer, and the agents she worked with started to complain about her handwriting.  (R. 242.)

## C. *Mental Impairment*

### 1. General Mental Health Information

Plaintiff claims that some days her goal is "just to stay together mentally and not let the pain get [to her]." (R. 64.) On April 30, 2002, the Department of Health noted that Plaintiff claimed her memory worsened when she started menopause, but she had not sought psychiatric treatment, nor was she taking any psychotropic medications, and there was no mention of memory problems prior to this. It was noted that Plaintiff did not

8

display any memory or cognitive deficits when she called to speak to the department or in her forms. Plaintiff stated that her memory lapses did not interfere with her activities of daily living, but that she was in constant pain which limited her concentration. (R. 81.) On June 21, 2002 and at other times, Dr. Phillips noted on his routine visit form that Plaintiff was oriented times three, she had good recent and remote memory with appropriate mood, and good insight.  (R. 106, 113, 195. 197.)

On a personal wellness profile completed on October 2, 2002, it was noted that Plaintiff was having trouble sleeping. (R. 122.) Previously, in September of 1997 and May 29, 1998, Dr. Webb noted that Plaintiff "for the most part, [ ]does not experience any sleeping difficulty." (R. 142, 144.) At that time he found her to be "alert, pleasant, and cooperative." (R. 142, 144.)

At the hearing, Plaintiff testified that she had become antisocial, no longer enjoying going out to see people or talk to them, and she had suicidal thoughts about driving her car into the house or a tree. (R. 237-238.) She also testified that she was feeling depressed prior to December 2002 and traveled with her husband so that he could prevent her from harming herself. Her doctor had taken her off of the medication Zoloft because it interfered with her sleep. (R. 238.)

### 2.  Dr. Corwin's Deposition Testimony and Report

On March 31, 2003, Dr. William Corwin, a psychiatrist (R. 174-180), was deposed with respect to a workers' compensation claim initiated by Plaintiff for an accident

occurring in her workplace on July 10, 1984.[22] (R. 150-173.) At the time of the deposition, Plaintiff was on no-work status until she received psychiatric treatment. (R. 164.) Plaintiff was initially referred to Dr. Corwin by her attorney, Ms. Sims, but she did not return to see him for follow-up care after the initial consultative examination. (R. 168.)

### a. Plaintiff's Symptoms of Depression and Recommended Treatment

In the course of that deposition, Dr. Corwin testified that Plaintiff was suffering from depression, or a dysthymic disorder.[23]  (R. 155.)  He testified that he performed a Mental Status or psychiatric evaluation of Plaintiff, and found that she had a Global Assessment Functioning ("GAF") score of 55, which means that her symptoms of depression were between moderate and severe.[24]  (R. 166,155, 183.) Dr. Corwin testified that the basis for his diagnosis involved "the injury that Plaintiff suffered some years before," and that mental conditions sometimes do not develop until years after an injury has occurred.  (R. 156, 160.)

Dr. Corwin characterized dysthmia as a disturbance of mood and depressive syndrome, and found in Plaintiff's case that she suffered from anhedonia,[25] the pervasive

---

[22] The insurance company, American International Adjustment was represented by T. Daniel Webb at the deposition. He objected to Dr. Corwin's testimony twice on the basis that Dr. Corwin was not authorized to treat Plaintiff. (R. 154, 165.)

[23] A dysthmic disorder is similar to a major depressive episode and characterized by chronic depression that "occurs for most of the day more days than not for at least two year." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376 (4th ed. 200) [hereinafter DSM-IV].

[24] According to DSM-IV at 34, a score of 55 on the Global Assessment Functioning reflects that Plaintiff has "moderate symptoms OR moderate difficulty in social, occupational, or school functioning."

[25] Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts."  Merriam -Webster's Collegiate Dictionary 45 (10th ed. 2001).

lack of interest and enjoyment of life, appetite disturbance, change of weight,[26] sleep disturbance, psychomotor retardation, decreased energy, and feelings of worthlessness. (R. 157-58, 183.) He testified that Plaintiff's claims that she is nervous, anxious, depressed, irritable, chronically fatigued and cries without notice, tears running down her face throughout the day" are consistent with what he saw of Plaintiff upon examination and his diagnosis. (R. 183, 159, 161 -162.)

He recommended that Plaintiff take antidepressants or other medication and also engage in psychotherapy. (R. 160, 183.) He noted in his report that Dr. Phillips prescribed Zoloft to Plaintiff in January of 2003. (R. 183.) Dr. Corwin testified that while Plaintiff could improve on her own, it would be better to treat her to avoid the development of more serious symptoms. (R. 161-62.) Plaintiff had already experienced suicidal thoughts and "any depressed person is potentially suicidal." (R. 168, 183.) Plaintiff seemed to him to be "more depressed than the average case of what one would call a simple depression based upon some superficial circumstance in a person's life," (*Id.*) and that "without treatment it would be difficult to say that she is under MMI provisions."[27] (R. 170.)

### b. Effects of Depression on Functional Limitations

Dr. Corwin also testified that Plaintiff had marked restrictions of daily activity because she no longer enjoyed her daily activities, and was "limited in her capacity to do things around the home." (R. 158, 183.) She had marked difficulties maintaining social

---

[26] Although Plaintiff had gastric bypass surgery, Dr. Corwin testified that some people tend to regain their weight because they do not follow through on a weight loss regimen or are "under stress for other reasons."  (R. 164.)

[27] MMI stands for Maximum Medical Improvement.  (R. 170.)

functioning and no longer participated in such social activities as bowling and horseback riding. (R.158, 160.) He also testified that she had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (R. 158, 183), and that in her present condition she would not be able to maintain consistent concentration for two hours or longer. (R. 159.) He believed she would have difficulty even in a sedentary job if she was expected to work a forty hour week, five days a week. (R. 161, 170.) He found that Plaintiff was too depressed to work, but possibly could do "very simple things, [like] stuff envelopes."  (R. 166-67, R. 170.) Dr. Corwin also opined that if Plaintiff's depression arose in 1997, and was as severe at the time he conducted his examination as it was in 1997, the limitations he described would apply as far back as 1997. (*Id.*, R. 164.)

Dr. Corwin also noted that based on his observations of Plaintiff and discussions with her, there seemed to be some impairment in her recent memory.  As to her psychomotor skills, she had slowed down in her physical activities.  (R. 162.)  During the examination, Dr. Corwin noted that her appearance was "neat and tidy" and she was "correctly oriented," "attentive, cooperative, and relevant in her replies" with adequate insight and judgment. (R. 183.)

# V.  DISCUSSION[28]

## A.  *Hand/fingering Impairment*

The Plaintiff contends that the evidence of her handling and fingering impairments, which supports her claim that she cannot return to her past relevant work as a secretary,[29] was not given proper consideration by the ALJ. The Commissioner asserts that most of the evidence showing an impairment of Plaintiff's handling and fingering abilities occurred after the insured period. In addition, the Commissioner asserts that the ALJ did not err in weighing the opinion of Plaintiff's other treating physician, Dr. Webb - which was given at a time closer to Plaintiff's last insured date - over the opinion of Dr. Phillips.

Plaintiff testified that the pain in her left hand was caused by nerve damage as a result of a misplaced IV when she had stomach surgery in 1987. (R. 245.) While Plaintiff complained of pain and numbness in both hands and arms, the medical evidence in the record prior to her last date insured does not reveal that Plaintiff's impairment was as severe as she alleged. On April 22, 2002, Dr. Phillips, Plaintiff's treating physician noted that Plaintiff had grip strength of 3/5 bilaterally and some limitation on fine and alternative

---

[28] Plaintiff requested oral argument on two issues. First, Plaintiff wanted an opportunity to reply to the Commissioner's argument that the ALJ did not commit reversible error by failing to assign specific weight to Dr. Phillips' April 2002 statements about Plaintiff's grip strength and dexterity. Second, Plaintiff also requested oral argument to discuss whether Dr. Corwin's opinion is supported by "psychiatric signs." The Commissioner objected to Plaintiff's request for oral argument. (Doc. 18.) The Court did not find oral argument necessary to resolve the issues presented in the parties' briefs. Accordingly, Plaintiff's motion for oral argument (Doc. 17) is hereby **DENIED.**

[29] The Dictionary of Occupational Titles § 201.362-030 (4th ed. 1991) defines a secretary as one who "[s]chedules appointments, gives information to callers, takes dictation, and otherwise relieves officials of clerical work and minor administrative detail. . . ." The strength requirement for this job is specified as that of sedentary work, and this job requires a high degree of finger dexterity and a medium degree of manual dexterity.

movement. (R. 110.) On January 20, 2003, a date closer to Plaintiff's last insured date, Dr. Webb noted that Plaintiff should not lift more than ten pounds and noted her chronic lumbar pain and spondylosis. He also recommended physical therapy for Plaintiff's back, but made no mention of any limitations regarding Plaintiff's hands or wrists.

In February 2004, Dr. Phillips found that Plaintiff had decreased sensation in her hand which made handling and fingering difficult, but the ALJ stated that he gave the opinion of Dr. Webb more weight because he assessed Plaintiff's functional capacity at a time closer to her last date insured. The ALJ found that the report of Dr. Phillips in 2004 reflected Plaintiff's recent condition, rather than her condition during her insured disability period. The ALJ may weigh the opinions of treating physicians as he deems appropriate under the agency guidelines, and he does not commit error by giving more weight to an opinion that was closer in time to the relevant insured disability period.[30] Based on the limited evidence in the record during the insured period, the ALJ did not err by finding that Plaintiff's manipulative limitations were not so severe as to preclude a full range of sedentary work.

**B. _Mental Health Impairment_**

Next, Plaintiff contends that the ALJ committed reversible error by not finding that Ms. Hammond's depression was a "severe impairment" at step two of the RFC analysis and by not finding that she had any functional limitations due to her depression at step four of the RFC analysis. The Commissioner asserts that the Plaintiff failed to show that

---

[30] _See_ 20 C.F.R. § 404.1527 (d) (describing how the Commissioner weighs medical opinions); _see also_ Sharfarz v. Bowen, 825 F.2d 278 , 279 (11th cir. 1987) ("[T]he  ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons thereof.").

her severe depressive disorder occurred on or before the last insured date for her

disability status. The Commissioner further argues that the findings of Dr. Corwin, the

consulting psychiatrist, were not entitled to great weight due to their inconsistency with

Plaintiff's treating physician and the lack of clinical testing to support his finding that

Plaintiff had a depressive disorder.

The ALJ does not need to find all of Plaintiff's impairments severe at step two to

proceed with the RFC analysis. At step two, the ALJ only needs to find that the individual

has at least one impairment which affects her ability to perform basic work activities.[31]

The burden is on the Plaintiff to establish that she has a severe impairment, but such a

threshold is minimal and easily met.[32] The ALJ must then take any other impairments

into account when determining Plaintiff's RFC at step four. Here, the ALJ found that the

Plaintiff's hypertension, obesity, and chronic lumbar pain were "severe" at step two, and

it is not reversible error that the ALJ did not include Plaintiff's mental impairment in the

finding a step two. However, the ALJ erred at step four because he failed to consider

Plaintiff's mental impairment when determining Plaintiff's RFC.

The ALJ stated that he did not give any weight to the evidence from Dr. Corwin

about Plaintiff's depression for two reasons. First, the ALJ stated that he did not give Dr.

Corwin's opinion any weight because his findings were inconsistent with those of Dr.

---

[31] 20 C.F.R. §§ 416.920(c), 416.921(a).  Basic work activities include the following: "1) physical functions such as walking, standing, sitting, lifting, pushing, pulling . . . ; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers and usual work situation; and 6) dealing with changes in a routine setting.  20 C.F.R. § 416.921(b ); *see also* Stokes v. Apfel, No. CA 97-1200-BH-C, 1998 U.S. Dist. LEXIS 16475, at *4 (S.D. Ala. 1998).

[32] McDaniel v. Bowen, 800 F.2d 1026, 1031(quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).

Phillips, Plaintiff's treating physician. Second, the ALJ stated that because Plaintiff was traveling with her husband without pain or sleeping difficulty, such activity shows that Plaintiff had no trouble leaving the house. (R. 16.)

With respect to the issue of according proper weight to medical opinions, although Plaintiff was not examined by Dr. Corwin until after her last insured date, Dr. Corwin found that Plaintiff's depression began sometime after her injury or possibly as far back as 1997. Evidence submitted after the last insured date is considered relevant in determining disability as long as the evidence relates to a condition that occurred during the disability period.[33] Consequently, the ALJ was entitled to consider the medical opinion of Dr. Corwin as evidence of Plaintiff's mental impairment because Dr. Corwin's findings are relevant to the period of insured disability.

In addition, pursuant to 20 C.F.R. § 404.1527, the Commissioner is required "generally to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." The ALJ failed to follow this regulation when he stated that he "assigns no weight to that opinion [of Dr Corwin] as it is inconsistent with the psychiatric evaluation by the treating source, Dr. Phillips." Notably, the ALJ acknowledged that the treating physician is not a psychiatrist, nor has any specialization in the area of psychiatry. Dr. Corwin, on the other hand, is a psychiatrist, who is board certified in Psychiatry, Forensic Psychiatry, and Neurology.[34]

---

[33] Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983).

[34] R. 178.

In determining Plaintiff's RFC, the ALJ should have considered Dr. Corwin's findings concerning Plaintiff's functional limitations resulting from her depression. Dr. Corwin found that Plaintiff had marked difficulties maintaining social functioning, and deficiencies in concentration and persistence of pace which would keep her from completing tasks in a timely manner. (R. 158.) He testified that in her depressed condition she would not be able to maintain consistent concentration for more than two hours and would have difficulty in any sedentary job which required her to work a forty hour week, five days a week. (R. 159, 161-62, 170.)  He also noted some impairment in Plaintiff's recent memory and psychomotor retardation. (R. 162.) Dr. Corwin found Plaintiff had a Global Assessment Functioning score of 55 and was too depressed to work. (R. 166-167.)

Accordingly, the ALJ erred by failing to give proper weight to Dr. Corwin's opinion as a psychiatric specialist that Plaintiff suffered from depression which impeded her basic work skills during her insured period. There is substantial evidence in the record consisting of Dr. Corwin's deposition testimony and his medical report establishing that Plaintiff's depression could have occurred as far back as 1997 due to the workplace injury in 1984, and most likely was present and affected her ability to work during her insured disability period.

Further, the ALJ erred by rejecting Dr. Corwin's opinion on the grounds that it was inconsistent with the opinion of Dr. Phillips, who was not a specialist in psychiatry. Indeed, there were consistencies between the findings in the reports of Drs. Corwin and Phillips. Dr. Corwin testified that he performed a Mental Status Examination, or psychiatric evaluation, of the Plaintiff.  In Dr. Corwin's report, he noted that Plaintiff was

17

"correctly oriented," with some impairment in recent memory, though she possessed adequate insight and judgment. Similarly, on most of Plaintiff's visits with Dr. Phillips,[35] he noted that she was oriented times three, had good recent and remote memory with appropriate mood and insight. While there is no inconsistency between these opinions of Plaintiff's orientation and insight, the findings by Dr. Phillips - as compared to the findings by Dr. Corwin - are not based on a psychiatric evaluation. Although, Dr. Phillips' notes do not reveal that he made any further evaluation of Plaintiff's mental condition,[36] nonetheless, Dr. Phillips prescribed Zoloft to Plaintiff in January of 2003, shortly after her date last insured. Zoloft is a medication used to treat depression and anxiety. Far from being inconsistent, such a prescription by Dr. Phillips further supports Dr. Corwin's findings *upon psychiatric evaluation* that Plaintiff's depression and anxiety may have dated as far back as 1997, but existed prior to January 2003, during her insured period of disability.

Finally, the ALJ's finding that Plaintiff's depression was not sever because she was able to travel with her husband is not based on substantial evidence. The ALJ found that because Plaintiff was traveling with her husband she did not have any problems leaving the house, and was not experiencing pain or sleep difficulty during that time. Significantly, the record reflects at that same time Plaintiff was having suicidal thoughts and testified that she thought about driving her car into the house or into a tree. (R. 238,

---

[35] The record contains Dr. Phillips' notes from March of 2002, June of 2002, August of 2003, and January 2004.  (R. 106, 113, 195, 197.)

[36] Craig v. Apfel, 10 F. Supp. 2d, 966, 969 (N.D. Ill. 1998) (citing Wilder v. Chater, 64 F.3d 335, 337 (7th Cir. 1995)) ("[T]here is no reason to expect a doctor asked about an eye problem, or back pain, or an infection of the urinary tract to diagnose depression.  He is not looking for it, and may not even be competent to diagnose it.")

246, 183.) And most notably, Plaintiff testified that she was traveling with her husband so that he could "keep an eye on [her]" and "make sure that [she] would not do anything." (R. 247.)

Plaintiff stopped traveling with her husband in November 2001, but as previously discussed, her depression and suicidal thoughts occurred prior to the time she started traveling with her husband. This evidence, in addition to the diagnosis of dysthymic disorder by Dr. Corwin, supports Plaintiff's contention that her depression existed prior to December 2002, her date last insured.

Plaintiff also testified that she was able to sit in the truck because the truck had special seats that absorbed some of the motion of the truck. Plaintiff further stated at the hearing that when she was in pain, she was able to lie down in a bed in the truck, and that she spent more time in the bed than in the seat. (R. 247-248.) Contrary to the findings of the ALJ, Plaintiff continued to experience pain while traveling with her husband.

Consequently, the ALJ's findings that Plaintiff's mental and physical impairments were not sever because Plaintiff could travel with her husband is not supported by the substantial evidence in the record.

## VI. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that pursuant to the fourth sentence of 42 U.S.C. § 405(g) the decision of the Commissioner is **REVERSED AND REMANDED**. Upon remand the Commissioner should (1) give appropriate weight to the opinions and evidence from Dr. Corwin; (2) reassess Plaintiff's RFC, taking into consideration her mental impairment in light of the opinions of Dr. Corwin, and whether

such mental impairment restricted Plaintiff's ability to perform her past relevant work; and (3) conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 7, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel